**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| **SANDRA DENMAN** | ) | **CASE NO. 4:05 CV 1910** |
| | ) | |
| **PLAINTIFF** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **YOUNGSTOWN STATE** | ) | |
| **UNIVERSITY** | ) | **MEMORANDUM OPINION** |
| **DEFENDANT** | ) | **AND ORDER** |
| | ) | |

Plaintiff brought this six-count complaint alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 et seq., and the Equal Pay Act ("EPA"), 29 U.S.C. §§ 201 et seq. Before the Court are Defendant's Motion for Summary Judgment, (Dkt. # 99), Plaintiff's Opposition, (Dkt. # 108), Defendant's Reply (Dkt. # 110), Plaintiff's Sur-reply, (Dkt. # 113), and Defendant's Response to Sur-reply, (Dkt. #116). For the following reasons the motion for summary judgment is **DENIED**.

This matter is before the Court upon Defendant's Motion for Summary Judgment. (Dkt. # 99). Plaintiff has filed an Opposition to Defendant's Motion, (Dkt. # 108),

1

Defendant has filed a Reply in Support of its motion, (Dkt. # 110), Plaintiff has filed a Sur-Reply, (Dkt. # 113), and Defendant's have filed a Response to the Sur-Reply, (Dkt. # 116).

For the following reasons the motion for summary judgment is **DENIED**.

## I. FACTUAL BACKGROUND

The following facts are in dispute. Sandra Denman ("Denman") was hired by Youngstown State University ("YSU") as General Counsel and Assistant to the President in March 1994, and served in this position until June 2004. Denman was originally employed under a one-year contract, but was given a three-year contract effective July 1995. (Dkt. # 93-2 at 56-57; Dkt. # 93-14). YSU renewed Denman's three-year contract for consecutive three-year terms during the remainder of her tenure. (Dkt. #s 93-15, 93-16, 93-17). Denman's final employment contract renewal was in July 2001. (Dkt. # 93-17).

Denman asserts that she was granted continuity of employment ("COE") in 1999, which provided that her contract could be non-renewed only for cause and granted her certain appellate rights if she was non-renewed. (Dkt. # 92-8 at 23). Defendant contends that, as a non-teaching employee serving under a multi-year contract, Denman was not subject to the COE policy. (Dkt. # 99 at 2).[1] Denman claims that the YSU Board of Trustees ("Board") first looked into the validity of her COE in February 2004.

David Sweet became President of YSU in July 2000. Although Sweet received

---

[1] Defendant concedes that Denman received a letter from President Leslie Cochran dated August 6, 1999, indicating that Denman had "achieved Continuity of Employment." Defendant argues, however, that, under Ohio law, Cochran was not authorized to grant non-terminable employment without agreement of the YSU Trustees. Therefore, according to Defendant, "this promise was void as a matter of law." (Dkt. # 99 at 3).

complaints about Denman and the efficiency of the General Counsel's office, he received no written complaints and renewed Denman's contract in 2001. Sweet reviewed Denman's performance in 2001 and gave her an overall rating of 4 out of 5, "exceeds requirements." In 2003, Denman's overall rating was 3.7 out of 5, between "satisfactory" and "exceeds requirements." (Dkt. #93-12).

In 2002, YSU retained Buck Consultants to evaluate YSU's compensation system and to address possible inequities ("Buck Study"). Prior to the Buck Study, YSU had no objective measures for making pay decisions. (Dkt. # 108-4 at 8-9). The Buck Study categorized various university positions within job families and pay grades depending on knowledge, skills and abilities required for the respective positions. (Dkt. # 108-4 at 10). Denman was placed in the same pay grade as Vice President for Administration John Habat. ("Habat"). Denman accepted her placement into her pay grade, which provided for a salary between $88,893 and $133,339. Denman's previous salary was $84,289 after 9.3 years in her position, while Habat's previous salary was $129,500 after one year in his position. (Dkt. # 97-6). Both individuals are lawyers. In July 2003, Denman received a raise to bring her salary up to the minimum in her pay grade.

The Buck Study also recommended that YSU raise certain salaries above the minimum if those salaries were compressed, because newer hires were earning more than longer-tenured employees. Accordingly, the Buck Study recommended that Denman receive an additional raise of $6,223, and that another female dean, Betty Jo Licata, receive an additional raise of $1,290. (Dkt. # 97-5). No other compression adjustments were

recommended. Neither Denman nor Licata received an additional compression adjustment. However, several males were given raises, although they were not recommended by the Buck Study. (Dkt. # 108-4 at 16).

In September 2003, Denman reviewed an executive compensation analysis and concluded that it revealed that YSU discriminated against women with respect to pay. Consequently, on September 18, 2003, Denman sent two memoranda to Sweet regarding her conclusions. The first memorandum, which Denman sent in her official capacity as General Counsel, warned Sweet that YSU might be exposed to liability based on its discriminatory compensation practices. (Dkt. #93-30). The second memorandum, which Denman sent in her individual capacity, claimed that she was being discriminated against because of her gender. (Dkt. #93-30).

According to Sweet, he had not decided, in September 2003, whether he would renew Denman's contract, which was set to expire in July 2004. (Dkt. 108-30 at 23-25). On September 23, 2003, Habat informed Sweet that he did not have cause to remove Denman. (Dkt. # 108-16 at 25). Sweet notified Franklin Bennett, a member of the YSU Board, on September 29, 2003, that Denman's contract would not be renewed. (Dkt. # 108-1 at 6-7). The Board took no action regarding Denman's non-renewal. (Dkt. # 108-1 at 2). On October 20, 2003, Sweet sent a memorandum to Chander Kohli, Chairman of the YSU Board, asking the Board to clarify Sweet's role in the selection, supervision, and removal of the General Counsel. (Dkt. # 98-8). When asked during his April 13, 2007, deposition why he sought to clarify his authority over such matters, Sweet responded as follows:

4

> Q: You wrote a memo in which you asked the Board of Trustees to consider a conflict between a memorandum of understanding with the attorney general's office and your grant of a three-year contract to her and President Cochran's grant of continuity of employment to her, correct?
> A: Yes.
> Q: And this occurs about a month after she complains about gender discrimination? This is just timing.
> A: I'm willing to respond to your timing issue, because the fact of the matter is, I was very comfortable in my role being able to terminate the general counsel before writing that memo. And you're seeking, in my opinion, to raise a question that this is a triggering point. It was a triggering point for getting clarification, but it had no relevance to my understanding of my role and responsibility.

(Dkt. # 108-30 at 31). Sweet notified Denman on December 17, 2003, that her contract would not be renewed. (Dkt. # 93-22).

On August 3, 2005, Plaintiff filed the instant six-count complaint, alleging gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 et seq., and the Equal Pay Act ("EPA"), 29 U.S.C. §§ 201 et seq. (Dkt. # 1).

## II.  LAW AND ANALYSIS

### A.  Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ P. 56(c). The court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the non-moving party." Little v. BP Exploration & Oil Co., 265 F.3d 357, 361 (6th Cir. 2001). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); accord Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 556-57 n.7 (6th Cir. 2000). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52. "A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56 (c)). For a dispute to be genuine, the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

### B. Wage Discrimination Claim

Denman asserts gender-based wage discrimination under the EPA. To establish a *prima facie* case of wage discrimination under the EPA, the plaintiff must demonstrate that an employer pays different wages to employees of opposite sexes "for equal work on jobs

the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1)).[2] "Equal work" does not require that the jobs be identical, only that there exist "substantial equality of skill, effort, responsibility and working conditions." Odomes v. Nucare, Inc., 653 F.2d 246, 250 (6th Cir. 1981). Whether the work of two employees is substantially equal "must be resolved by an overall comparison of the work, not its individual segments." Beck-Wilson v. Principi, 441 F.3d 353, 362 (6th Cir. 2006). Thus, the focus is solely on the "the skills and qualifications actually needed to perform the jobs considered," and not on education and experience. Id., at 363.

Denman alleges that she was paid less than Habat, a male colleague in the same pay grade. Denman further asserts that she was paid less than the other male members of Sweet's cabinet. The only specific evidence YSU cites in support of their argument that Denman and the other members of the cabinet did not perform equal work is the fact that Tom Maraffa, a cabinet member who acted as Sweet's special assistant, has the additional job duties of representing the president at meeting, drafting speech and trouble shooting (Dkt. # 99). In contrast to this assertion, the record supports the conclusion that these named individuals performed substantially equal work. Hugh Chatman, YSU's former

---

[2] Unlike the showing required under a Title VII disparate treatment claim, the plaintiff in an EPA claim does not have to demonstrate proof of discriminatory intent. See Beck-Wilson 441 F.3d at 360.

7

Executive Director, Human Resources and Labor Relations, testified that Habat and Denman were in the same job grade and job family. (Chatman Depo., at p. 29). Similarly, each of Sweet's cabinet members were responsible for supervising and overseeing a particular area of the university. Denman has offered sufficient evidence that she performed worked substantially equal to that of Habat and Sweet's other cabinet members.

It is also plain that Denman received less pay for this comparable work. Denman's salary was $84,289 and Habat's salary was $129,500. The other male members of Sweet's cabinet made between $93,890 and $144,000. Therefore, the Court finds that Denman established a *prima facie* case of sex-based pay discrimination. See Corning Glass Works v. Brennan, 417 U.S. at 195.

Once a plaintiff establishes a *prima facie* case of wage discrimination, the burden shifts to the defendant to prove that the difference in wages is justified by one of the affirmative defenses enumerated in 29 U.S.C. § 206(d)(1). Buntin v. Breathitt County Bd. Of Educ., 134 F.3d 796, 799 (6th Cir. 1998). The statutory affirmative defenses are: a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or any factor other than sex. See Corning Glass Works, 417 U.S. at 196; Buntin v. Breathitt County Bd. Of Educ., 134 F.3d 796, 799 (6th Cir. 1998). Here,YSU asserts the fourth factor as the basis for Denman's lower salary. This EPA's catch-all provision "does not include literally *any* other factor, but a factor that, at a minimum, was

8

adopted for a legitimate business reason." EEOC v. J.C. Penney Co., Inc., 843 F.2d 249, 253 (6th Cir.1988). In order to be entitled to summary judgment, the defendant must prove that there is no genuine issue of material fact as to whether pay is due to a factor other than sex. EEOC v. Romeo Cmty. Sch., 976 F.2d 985 (6th Cir. 1992). The employer must prove that "sex provides *no part* of the basis for the wage differential" in order to prevail on summary judgment. Timmer v. Mich. Dep't of Commerce, 104 F.3d 833, 844 (6th Cir. 1997).

To demonstrate that the pay differential was supported by a legitimate business interest, YSU points to the fact that Denman's responsibilities were confined to the Office of the General Counsel.[3] YSU compares Denman to Maraffa, who was responsible for managing "wide-ranging campus projects." (Dkt. # 99). YSU also notes that Maraffa "had a lengthy tenure." Although experience and skills may justify a pay differential in some instances, Balmer, 423 F. 3d at 612, here the differences are not significant enough to support summary judgment. On this record, the Court finds that a reasonable jury could determine that sex played a role in determining Denman's wage.

---

[3]

YSU also contends that the pay differential between Denman and her male co-workers exists as a result of a "collectively bargained wage system" that constitutes a "legitimate business reason" under the catch-all provision. YSU's affirmative defense relies solely on the Seventh Circuit case Lang v. Kohl's Food Stores, Inc., 217 F. 3d 919, 925 (7th Cir. 2000). In Lang, the court stated that a Plaintiff could not simply compare wages for similar job categories at different locations of a chain department store across the state because collective bargaining agreements varied by location. Id. As this holding has no bearing on analysis in the instant case, YSU has not established that the wage differentials are justified by a collective bargaining agreement.

### C. Retaliation

Denman asserts that YSU retaliated against her for writing the September 18 letter by non-renewing her contract. The EPA makes it unlawful to retaliate against a person because they have participated in a protected activity. To establish a *prima facie* case of retaliation under the EPA, a plaintiff must show: (1) that she engaged in protected activity; (2) that the defendants knew she exercised protected rights; (3) that as a result of her exercise of protected rights the defendants took employment action adverse to plaintiff; and (4) that there was a causal connection between the protected activity and adverse employment action. EEOC v. Romeo Community Schools, 976 F.2d 985, 989 (6th Cir. 1992); Fenton v. HiSAN, 174 F.3d 827, 831 (6th Cir. 1999) (citing EEOC v. Avery Dennison Corp., 104 F.3d 858, 860 (6th Cir. 1997)). YSU does not dispute that Denman's termination and alleged disparate pay are adverse employment actions. However, Defendant argues that Denman has not met the other three elements of her *prima facie* case.

Defendant argues that Denman has failed to state a claim for retaliation because her September 18 letter does not rise to the level of a "protected activity" under the EPA statute. However, the EPA applies to the unofficial assertion of rights through complaints at work. EEOC v. Romeo Community Schools, 976 F.2d 985, 989 (6th Cir. 1992). Denman's letters to YSU rise to the level of a protected activity under the EPA because they are an assertion of a statutory right to equal pay under the EPA. In addition, YSU was made aware that Denman exercised a protected right, as evidenced by the fact that Sweet

10

responded to Denman's letter by arranging a meeting with Haabat to discuss her complaints.

YSU asserts that Denman cannot, however, establish a causal connection between the September 18 letter and the non-renewal of Denman's contract. As YSU points out, mere temporal proximity is insufficient, by itself, to raise an inference of a causal connection between the protected activity and the retaliatory act. Nguyen v. City of Cleveland, 229 F. 3d 559, 566 (6th Cir. 2000). However, eleven days after Denman wrote the September 28 letter, Sweet told Bennet he intended to non-renew Denman's contract. This temporal proximity, in combination with Sweet's acknowledgment that the letter was a "triggering point" that caused him to seek advice about the legality of non-renewing Denman's contract, creates a triable issue of fact as to whether Denman was retaliated against for participating in a protected activity.

Even if the Court were to conclude that defendant successfully showed that no reasonable jury could find that Denman was retaliated against for the September 18 letter, Denman has met her burden of production, creating a triable issue that the reasons offered by Defendant are pretextual. Balmer, 423 F. 3d at 613. YSU claims that it terminated Denman for her poor performance and mismanagement of the General Counsel's Office, problems which allegedly began prior to Denman's September 18 letter. Sweet sent Denman a memo five days after September 18 letter, in which he chastised Denman for acting "unprofessional, rude, and embarrassing" in a meeting that occurred eighteen months

11

earlier. (Dkt. # 93, Ex. 30). Habat described this memo as "retaliatory." (Habat Depo, p. 187). Additionally, when asked whether Denman was "being ungrateful" for complaining about gender pay discrimination after receiving a large pay increase, Sweet admitted that "there were some questions raised in [his] mind about that." (Sweet Depo., p. 107). These comments create a triable issue as to whether YSU's reasons for non-renewing Denman's contract were mere pretext for retaliatory conduct.

The Sixth Circuit has held that a Title VII claim of wage discrimination is coextensive with a claim under the EPA insofar as the former incorporates the EPA's affirmative defenses. Beck-Wilson, 441 F. 3d at 369 (citing Washington County v. Gunther, 452 U.S. 161, 167-71 (1981)). As such, a defendant may avoid liability under Title VII if it can establish one or more of the EPA's affirmative defenses. Id. The Sixth Circuit has further held that the converse is true. When a plaintiff successfully defeats a defendant's motion for summary judgment pertaining to her EPA claim by raising a genuine issue of material fact as to defendant's affirmative defenses, she also defeats the defendant's motion for summary judgment concerning a parallel Title VII claim. Id. (citing Buntin, 134 F. 3d at 801). Thus, because defendants are unable to prevail on their summary judgment motion regarding Denman's EPA claims, they are not entitled to summary judgment on Denman's claims under Title VII and Title IX.[4]

---

[4] In analyzing Title IX discrimination and retaliation claims, courts generally apply Title VII standards. Odomes v. Nucare, 653 F. 2d 246 (6th Cir. 1981).

### D. Limitation Period

YSU asserts that Denman's pay discrimination claims under Title VII and Title IX are time-barred under Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162 (2007). YSU argues that Denman's claims are time-barred because the last possible triggering act – the raise she and other YSU administrators received in July 2003, when the recommendations of the Buck Study were implemented – occurred outside the 300-day statute of limitations. Denman counters, arguing that triggering acts occurred throughout the Fall of 2003 and into 2004, when her male counterparts were given additional raises.

In Ledbetter, the Court noted that in the context of an EEOC complaint that the limitations period "is triggered when a discrete unlawful practice takes place." Id. at 2169 at 2169. It also stated that while (A) "a freestanding violation may always be charged within its own charging period," and (B) "if an employer engages in a series of acts each of which is intentionally discriminatory…a fresh violation takes place [with] each act,"it is nevertheless the case that "[a] new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." Id. at 2169. In determining the accrual date for filing an EEOC claim, the Supreme Court emphasized the importance of focusing on the specific employment practice or act that is at issue. National R.R. Passenger Corp., 536 U.S. 101, 110-111 (2002). "Because a pay-setting decision is a

13

discrete act, it follows that the period for filing an EEOC charge begins when the act occurs." Ledbetter, 127 S.Ct. at 2165.

Ledbetter argued that her claim was not time-barred despite the fact that the pay-setting decision occurred outside the statute of limitations because each paycheck she received under a facially neutral pay scheme was part of one continuing violation of federal law. The Court rejected her argument, finding that the time period for filing an EEOC charge begins when the "pay-setting" decision occurs. Ledbetter, 127 S.Ct. at 2165.

Here, Denman alleges that YSU's denial of her request for a raise in the September 18, 2003, letter constitutes a discrete unlawful practice. Thus, Denman is alleging facts fundamentally distinguishable from those in Ledbetter, because YSU's decision to deny Denman's raise and non-renew her contract are clearly discrete acts. As the Court noted in Ledbetter, "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of such "discrete" acts. Ledbetter, 127 S. Ct. at 2162. All discriminatory conduct alleged in Ledbetter fell outside the limitations period, and the Court determined that "the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination" did not trigger a new charging period. Id. Denman's claim is distinguishable because the alleged discriminatory act of termination occurred on September 18, 2003. Denman's Title VII claims are therefore not barred by the limitations period, as she filed a complaint with the EEOC on May 12, 2004. With respect to claims

14

brought under Title IX, the Court notes that Plaintiffs concede that only claims relating to events that occurred after August 5, 2003 are timely.

In its motion for summary judgment, YSU failed to raise any other grounds for summary judgment on Denman's Title VII and Title IX pay discrimination claims. The Court declines to consider YSU's alternative grounds for summary judgment, which were not raised until YSU's reply memorandum. See United States v. Lopez-Medina, 461 F.3d 724, 743 (6th Cir. 2006).

## VI. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**. The Court orders that a status hearing shall be held on February 28, 2008 at 2:00 p.m. Counsel shall appear in person**.**

**IT IS SO ORDERED.**

> **/s/ Peter C. Economus   -  February 20, 2008**
> **PETER C. ECONOMUS**
> **UNITED STATES DISTRICT JUDGE**

15